**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Richard Keith GILMORE, Defendant-
Appellant.**

**No. 16318.**

United States Court of Appeals
Seventh Circuit.

July 25, 1968.

---

17. See note 16 supra.

Edward G. Maag, E. St. Louis, Ill., for appellant.

Carl W. Feickert, U. S. Atty., Joel A. Kunin, Asst. U. S. Atty., E. St. Louis, Ill., for appellee.

Before SCHNACKENBERG, KILEY and FAIRCHILD, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Richard Keith Gilmore, defendant, has appealed from his conviction on two counts of an indictment, following a trial by jury, of the theft of $1897.95 from Mt. Erie State Bank, Mt. Erie, Illinois, on or about November 1, 1965, the deposits of which were insured by the Federal Deposit Insurance Corporation, said theft being by the use of a gun and putting in jeopardy the life of a bank employee, Lemuel S. Gardner, in violation of Title 18 U.S.C. §§ 2113(a) and (d).

Defendant entered a plea of not guilty and made motions for a bill of particulars, for an order requiring the government to elect between counts I and II, which motions were denied, and for discovery and inspection under rule 16 of the Federal Rules of Criminal Procedure. The motion for discovery and inspection was allowed.

The jury found defendant guilty on both counts and the court denied defendant's motion for a new trial. Sentence to imprisonment for eight years was imposed on defendant.

1. The only eye witness testimony to the November 1, 1965 robbery was given on January 24, 1967 by Lemuel S. Gardner, who when testifying for the prosecution some fifteen months after the crime occurred, identified defendant as the robber of the bank. Gardner testified that he was then "past 70 years old" and he was, then and on November 1, 1965, wearing bifocals.

However, in a typewritten statement made by federal agent Lyle on February 25, 1966 and typed under date of March 10, 1966 (Court Exh. No. 5), the agent wrote:

"Mr. Lemuel S. Gardner viewed Richard Gilmore in a *lineup* in the Wayne County Courthouse in Fairfield, Illinois. Mr. Gardner picked Richard Gilmore from the *lineup* and positively identified him as the individual who had held up this bank on November 1, 1965. Mr. Gardner hesitated for quite a while before identifying Gilmore but did make a positive statement that this is the man, 'I am sure of it; however, I will not swear to it.' He stated he is as sure as he can be that this is the man; however, he is afraid of making a mistake.

"After viewing Gilmore, Mr. Gardner stated Gilmore had small, high cheekbones which he had recalled previously and was dark complected and also had the proper height as he recalled. Mr. Gardner stated he would be willing to testify against Gilmore if one other witness could be developed who could identify him in the area. Mr. Gardner stated, in other words, he would like to have a second witness who agreed with him in this matter." [Italics supplied for emphasis.]

In regard to the reference in this statement to the "lineup" from which Gardner picked defendant, it becomes important to note that when Gardner was testifying at the 1967 trial of defendant, the following colloquy occurred on cross-examination:

Q. Mr. Gardner, on the 25th day of February, 1966 did you see Mr. Gilmore in a lineup of a number of people, or when you saw him there in the Fairfield courthouse was he just alone, by himself?

A. He was alone until we went in.

Q. He was alone until, you say, "we went in"?

A. Yes.

Q. Now, who went in?

A. Lyle and the sheriff.

Q. Lyle and the sheriff?

A. Yes.

Q. And was there a lineup where a number of individuals in addition to Mr. Gilmore stood up together and you were asked if you recognized anybody in the group?

A. No, there was no lineup.

Q. What?

A. No, *there was no lineup.*

Q. *There was just one single person in the room besides you and the sheriff and Agent Lyle?*

A. *That's right.*

Q. *And that single person in the room was Mr. Gilmore?*

A. *That's right.*

(Italics supplied for emphasis.)

Introduced as Court exhibit No. 1 is an FBI statement dated November 12, 1965, which relates:

That Gardner was "sorting pennies" when he turned around and an unknown individual was holding a long-barreled gun on him—that he placed in the bag the money from the drawer; that he was told by the robber to lie down on the floor, which he did, and that on later getting up he saw that no one was then in the bank, but saw a car with one person in it driving away at a high rate of speed; that he could not describe the vehicle as to make or model and that he (Gardner) did not observe any license as it drove out of town.

Gardner further stated according to exhibit No. 1, that he could not recall any of the man's facial features, although he wore no disguise, nor the clothing he wore except that the robber did not have on a suit coat; that he telephoned the Wayne County sheriff's office.

That Gardner made the statement on several occasions that he is certain that he would not be able to identify this individual in the future. He stated that even "if the individual walked in the bank now, I would not be able to identify him."

Court exhibit No. 5, an FBI report dated March 10, 1966, recites:

"Mr. Gardner picked Richard Gilmore from the lineup and positively identified him as the individual who had held up this bank on November 1, 1965. Mr. Gardner hesitated for quite a while before identifying Gilmore" * * *

and

" 'I [Gardner] am sure of it; however I will not swear to it'. He stated he is as sure as he can be that this is the man; however, he is afraid of making a mistake. * * * and he would be willing to testify against Gilmore if one other witness could be developed who could identify him in the area; * * * he would like to have a second witness who agreed with him in this matter."

During cross-examination of Gardner at the trial, the following occurred:

Q. As a matter of fact, sir, didn't you make this statement to agent Lyle at that time, the very day of the robbery, on several occasions? Didn't you repeat this statement several times? That you were certain that you would not be able to identify this individual in the future; and that you specifically stated to agent Lyle at that time, quote: "If the individual walked in the bank right now I would not be able to identify him." Unquote. Didn't you tell that to agent Lyle on November 1st, 1965?

A. I don't know whether I did or not, but then I was kind of flustrated right then; but when I seen him something told me what he looked like. * * *

However that may be, the value of Gardner's "identification" of defendant as the bank robber when Gardner was con-

fronted by a "lineup" consisting of only defendant Gilmore, is drastically minimized by the language of the court in United States v. Wade, 388 U.S. 218 (1967), where at 235–236, 87 S.Ct. 1926, at 1936, 18 L.Ed.2d 1149 the court said:

"Insofar as the accused's conviction may rest on a courtroom identification in fact the fruit of a suspect pretrial identification which the accused is helpless to subject to effective scrutiny at trial, the accused is deprived of that right of cross-examination which is an essential safeguard to his right to confront the witnesses against him. Pointer v. [State of] Texas, 380 U.S. 400, [85 S.Ct. 1065, 13 L.Ed.2d 923.] And even though cross-examination is a precious safeguard to a fair trial, it cannot be viewed as an absolute assurance of accuracy and reliability. Thus in the present context, where so many variables and pitfalls exist, the first line of defense must be the prevention of unfairness and the lessening of the hazards of eyewitness identification at the lineup itself. The trial which might determine the accused's fate may well not be that in the courtroom but that at the pretrial confrontation, with the State aligned against the accused, the witness the sole jury, and the accused unprotected against the overreaching, intentional or unintentional, and with little or no effective appeal from the judgment there rendered by the witness—'that's the man.'"

While the holding in *Wade* is not controlling here, the reasoning thereof as above-quoted by us was not criticized in Stovall v. Denno, 388 U.S. 293, 295 (1967), where the court said at 301, 87 S.Ct. 1967, at 1972, 18 L.Ed.2d 1199:

"We turn now to the question whether petitioner, although not entitled to the application of *Wade* and *Gilbert* [Gilbert v. State of Cal., 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178] to his case, is entitled to relief on his claim that in any event the confrontation conducted in this case was so unnecessarily suggestive and condu-

cive to irreparable mistaken identification that he was denied due process of law. This is a recognized ground of attack upon a conviction independent of any right to counsel claim. Palmer v. Peyton, 359 F.2d 199 (C.A. 4th Cir. 1966). The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned. However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it, and the record in the present case reveals that the showing of Stovall to Mrs. Behrendt in an immediate hospital confrontation was imperative. The Court of Appeals, *en banc*, stated, 355 F.2d 731, at 735,

'Here was the only person in the world who could possibly exonerate Stovall. Her words, and only her words, "He is not the man" could have resulted in freedom for Stovall. The hospital was not far distant from the courthouse and jail. No one knew how long Mrs. Behrendt might live. Faced with the responsibility of identifying the attacker, with the need for immediate action and with the knowledge that Mrs. Behrendt could not visit the jail, the police followed the only feasible procedure and took Stovall to the hospital room. Under these circumstances, the usual police station line-up, which Stovall now argues he should have had, was out of the question.'"

However, in the case at bar, no facts exist, such as those in *Stovall*, to excuse the procedure which actually occurred when the federal agents arranged to have Gardner appear at the lineup, because, as we have indicated, Gardner had no opportunity for selection since the "lineup" arranged for him to view consisted of one man, and that one man was defendant Gilmore.

The identification of defendant Gilmore in this case is at variance with the time honored method universally recog-

nized by law enforcement persons, which permits a complainant to select, from among several persons one about whom he is certain. Indeed we have only to note Gardner's hesitancy and his statement that he would not swear to the identification, to find lacking the constitutional requirement of due process of law.

Accordingly, we reverse the conviction herein and remand the case for another trial not inconsistent with the views herein expressed. In view of this disposition we need not reach other errors assigned by defendant.

Reversed and Remanded With Directions.

FAIRCHILD, Circuit Judge (concurring).

I concur in the result. I respectfully disagree, however, with the determination that the circumstances of the pre-*Wade* and *Gilbert* exhibition of defendant to the witness Gardner resulted in denial of due process when Gardner identified defendant at the trial. Those circumstances properly were for the jury's consideration in weighing Gardner's testimony, but do not compel the conclusion that his testimony was not probative.

I do believe, however, that defense counsel was entitled to possession of the "Jencks" statements at all times when they were reasonably useful in the process of impeachment by prior inconsistent statements, and that under the circumstances of this case it was prejudicial error to keep them from him while examining the federal agent.

KILEY, Circuit Judge, concurring.

I concur in Judge Schnackenberg's opinion that although United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, and Gilbert v. State of California, 388 U.S. 263, 266, 87 S.Ct. 1951, 18 L.Ed.2d 1178, do not reach back to Gilmore's conviction, the totality of circumstances here requires reversal of Gilmore's conviction for denial of due process in the admission of Gardner's identification testimony after a pretrial confrontation with Gilmore singly. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199. Gardner's initial uncertainty about identification of the robber followed by his positive testimony at trial demonstrates the dangers inherent in an identification made without proper safeguards.

Since this case is remanded for retrial, however, I think we should point out other imperfections at Gilmore's trial, to avoid possible repetition of these errors.

Gardner was the only eyewitness before and at the trial. The district court allowed Gilmore's attorney's motion, under the Jencks Act, for permission to use copies of Gardner's pretrial statements to FBI Agent Lyle in the cross-examination of Gardner. During the cross-examination, Gardner denied making some of the statements attributed to him and was vague about others. After the cross-examination the documents were returned by Gilmore's attorney. Against this background FBI Agent Lyle was called as a witness by defense counsel for the express purpose of impeaching Gardner. Gilmore's counsel was denied the use of the Jencks Act statements for this examination. I think a similar denial on retrial could be prejudicial error.

The trial began at 9:30 a. m. on January 24, 1967. On January 25 it resumed at 9:00 a. m., and the case was given to the jury at 8:30 that night, despite Gilmore's motion to adjourn trial to the next day. The government's brief defends this procedure on the sole ground that Gilmore has not clearly shown an abuse of the district court's discretion or prejudice. I think care must be exercised in well-intentioned expeditious disposition of court business lest a defendant be prejudiced. Jury deliberations which begin in the late evening present the danger of leading to a hasty and ill-considered verdict.

Finally, the United States Attorney asked Gilmore on cross-examination whether he was a gambler, and whether he made a pretrial statement to Agent

Lyle that his weight was down to "about 180 pounds" at the time of the robbery. The question concerning Gilmore's weight was important because Gardner had stated that the bank robber weighed about 180 pounds, and Gilmore weighed 220 pounds at trial. The relevancy of the question concerning gambling was never shown, and, although Gilmore denied making the statement to Lyle about his weight, the government did not call Lyle to rebut the denial. I do not attribute to government's counsel the deliberate use of an old prejudicial trial ploy in this instance. But I point out that the use of questions to create prejudicial implications about evidence or about the defendant's character, has been consistently criticized by the courts. Here again care must be exercised to avoid a retrial infected with prejudice.