UNITED STATES of America,
Plaintiff-Appellee,

v.

Steven GANTER, Defendant-Appellant.

No. 17912.

United States Court of Appeals,
Seventh Circuit.

Dec. 23, 1970.

Ronald P. Alwin, Chicago, Ill., for defendant-appellant.

William J. Bauer, U. S. Atty., Michael P. Siavelis, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, Jeffrey Cole, Asst. U. S. Attys., of counsel, assisted by Arnold Kanter, Legal Intern.

Before KNOCH, Senior Circuit Judge, and FAIRCHILD and PELL, Circuit Judges.

PELL, Circuit Judge.

Steven Ganter was convicted on a one count indictment charging him with violation of Title 18, United States Code, Section 111.[1]

1. Title 18, United States Code, Section 111 states:

"Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than

The evidence presented at the trial below established the following factual situation. On April 25, 1969, at approximately 2:00 p. m., Special Agent Craig of the Federal Bureau of Investigation was in the area of Kedzie Avenue and Fulton Street, Chicago, Illinois, conducting an official investigation of a selective service subject. As the agent walked north on the sidewalk adjacent to Kedzie, he spoke to a youth he passed. Craig then went into a building on Kedzie. While he was looking at the mail boxes, the outside door burst open and a man ran in and struck Craig in the face. In the ensuing struggle, which lasted for two or three minutes, Agent Craig recognized his assailant to be the youth he had passed on the street. When the agent felt the assailant trying to gain control of his gun, he identified himself as a federal officer.

The young man gained control of the gun, however, and pointed it at the agent while stating, "I ought to kill you." He then took the agent's money and credentials and struck him in the face with the gun before fleeing the scene. Craig pursued the assailant into an alley behind the building in which the attack took place. At this point the man threatened to shoot Craig, then he ran south through a gangway toward Fulton Street, at which point the agent lost sight of him.

Agent Craig, who was bleeding from facial wounds, then encountered the resident of the house adjacent to the gangway. The resident, at the instructions of Craig, called the police. Craig then went into the house to call his office. When he went back to the street the police had arrived.

Furnished with a description of the youth by the FBI agent, including information that the youth might be bleeding, the Chicago police made a search of the alleys and gangways and interviewed people in the area. Approximately one-half hour after the assault, the police obtained information which resulted in the arrest here in question. An "elderly male Negro" who told the police officers that "he didn't want to get involved" said that "he thought the offender could possibly be on the second floor of 3216 West Fulton." The anonymous informant did not state to the police that he had seen the offense being committed, nor that he had seen the youth fleeing the scene.

The police officers proceeded to the rear stairway of the building mentioned by the informant where they noticed what appeared to them to be fresh blood drippings on the stairs leading to the second floor. There were also similar blood drippings on the porch itself and what appeared to be blood was observed on the door of the second floor apartment. The officers knocked on the door, identified themselves as police officers and requested that the door be opened. When they received no response, the police kicked open the door and entered the apartment. As they entered, they sighted the defendant, Steven Ganter, standing in the hallway wearing bloodstained underwear.

Ganter was immediately placed under arrest and apprised of his Miranda rights. Other Chicago police officers at this time appeared at the front door and were let into the apartment. The defendant was asked where the gun was and responded by telling the officers it was under the couch, where it was in fact found. The defendant was placed in a police vehicle in order to be taken to the hospital where Agent Craig was being treated.

When they arrived at the hospital at approximately 3:00 p. m., the police went inside to tell Craig that they had a suspect in the wagon and would like Craig

$5,000 or imprisoned not more than three years, or both.

"Whoever, in the commission of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

Among those persons designated in 18 U.S.C. § 1114 is "any officer or employee of the Federal Bureau of Investigation of the Department of Justice, * * *."

to make an identification. Agent Craig went outside and identified the defendant as the person who had assaulted him. At this time the defendant was alone in the back of a police wagon.

From the hospital, the defendant was transported to the 11th District police station for processing. At about 4:20 p. m. this was completed and Ganter was released to FBI agents, who advised him of his Miranda rights. The defendant was then taken to the FBI office and was processed there. At approximately 5:20 p. m. Ganter began an interview with three FBI agents. Before proceeding, the agents inquired as to whether Ganter could read or write, and when he answered affirmatively he was furnished with a printed "Interrogation Advice of Rights Form." The defendant told the agents that he had read the form and understood his rights. After signing the waiver of rights form, Ganter declined the opportunity offered to confer with an attorney and proceeded to give the agents an oral statement. His statement admitted the alleged assault. The interview ended at about 6:45 p. m., at which time the defendant decided not to sign the statement which had been prepared.

## NECESSITY OF PROOF OF SCIENTER

Ganter contends that his motion for judgment of acquittal should have been granted because the government failed to prove the element of scienter as to the identity of the federal officer.

■ There is a split of authority as to the necessity of this proof. However, we find no direct authority on the point in this circuit. Annot., 10 A.L.R.3d 833 (1966). We believe the better rule applicable in the particular situation before us is that which was recently expressed in United States v. Kartman, 417 F.2d 893 (9th Cir. 1969), where the court stated at page 894:

"Knowledge of the official status of the victim of a forcible assault is not an element of that offense under 18 U.S.C. § 111. McEwen v. United States, 390 F.2d 47 (9th Cir. 1968).

* * *

"Defendant argues that the interpretation given section 111 in *McEwen* violates the holding of Morissette v. United States, 342 U.S. 246, 263, 72 S. Ct. 240, 96 L.Ed. 288 (1952), that legislative silence does not eliminate criminal intent from a statutory codification of a common-law crime which required mens rea. But *McEwen* holds only that specific knowledge that the victim is a federal officer is not an essential element of forcible assault under section 111. *McEwen* does not hold that the statute eliminates mens rea— the evil purpose or mental culpability which was the essential mental component of common-law assault and battery.

"This interpretation of the forcible assault prohibition in section 111 as requiring only mens rea, and not also specific knowledge of the victim's official status, comports with the legislative purpose, which was simply to provide a federal forum when the enumerated offenses were committed against federal officers engaged in the performance of federal duties. United States v. Wallace, 368 F.2d 537, 538 (4th Cir. 1966); United States v. Lomardozzi, 335 F.2d 414, 416, 10 A.L. R.3d 826 (2nd Cir. 1964); *see also* Burke v. United States, 400 F.2d 866, 868 (5th Cir. 1968)." (Footnotes omitted).

■ It must also be noted that while Ganter apparently had no knowledge of the identity of Craig as a federal officer at the time he initiated the attack, he learned shortly thereafter of the agent's federal identity. Notwithstanding the information having been communicated to him, he did thereafter point a gun at Craig.

■ In the state of Illinois one who points a loaded revolver at another, withing shooting distance, in a threatening manner, is guilty of an assault. People v. Preis, 27 Ill.2d 315, 318–319, 189 N.E.

2d 354 (1963). Ganter clearly committed assault with scienter.

For the foregoing reasons we conclude that Ganter's motion for judgment of acquittal was properly denied.

## MOTION TO SUPPRESS PHYSICAL EVIDENCE

Prior to trial, Ganter filed, pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure, a motion to suppress as evidence at the trial certain physical property, including the gun and various articles of clothing, which were seized at the apartment at the time of the arrest. The police, who had not obtained an arrest warrant, likewise did not have a search warrant when they took the items in question. Defendant maintains that there was no probable cause for the arrest, and therefore a warrantless search pursuant thereto was a violation of his Fourth Amendment rights. In this respect, Ganter contends that the tip of the unidentified informant did not provide probable cause.

■ An arrest is not constitutionally valid unless probable cause exists to make it. The determination of probable cause does not rest upon a technical framework; instead it depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Brinegar v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959). Thornton v. Buchmann, 392 F.2d 870, 872–873 (7th Cir. 1968).

■ The officers who made the arrest in the present case were aware that the assailant was armed with the agent's gun and could be considered dangerous. Furthermore, because of the short time span since the assault, they could reasonably believe that he was still in the area and that the time it would take to

get a warrant might allow him to escape from the neighborhood. Therefore, under the circumstances of this case, the exigencies of the situation made the arrest without warrant imperative. Warden Md. Penitentiary v. Hayden, 387 U.S. 294, 298, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948).

■ Following a hearing on the motions to suppress, the district judge made a specific finding that there was probable cause to make the arrest and that adequate Miranda warnings were given. On appeal we are required to accept such findings unless they are clearly erroneous. 3 Wright, Federal Practice and Procedure § 675, p. 130 (1969). United States v. Ziemer, 291 F.2d 100, 101–102 (7th Cir. 1961).

No one argues, we assume, that it is not desirable that those who violate the laws should be apprehended and apprehended promptly. The valid objection arises when the methods of apprehension are such that constitutional rights and privileges—designed to protect the innocent but under our Constitution equally available to the guilty—are violated.

As judges we are not so removed from the practicalities of criminal apprehension as not to realize that in the context of the situation, considering the Kedzie neighborhood where the police officers were operating, the likelihood of cooperation from the neighbors would be minimal. This is not necessarily from lack of desire to cooperate with the police but from a very real and demonstrable fear of reprisal being meted out to "one who talks."

As a matter of fact the informant so obviously was fearful of becoming involved that he told the officers not to look nor to point in the direction that he informed them of being the West Fulton Street apartment. We have no difficulty in construing under these circumstances that the statement the offender "could possibly be on the second floor of 3216 West Fulton" to mean that if the police

would look on the second floor of the indicated address they would find their quarry.

The fact that one of the neighbors was willing to supply this information, albeit in a guarded manner, to us raises a presumption of reliability on which the police properly could and did rely.

Further, informed by Agent Craig that the assailant might be bleeding, the police upon arriving at the building identified by the informant noticed blood on the stairs leading directly to the apartment where the assailant was actually located. In view of the exigencies of the situation and considering the practical aspects of obtaining any information at all in the particular neighborhood, the police had probable cause to make the arrest.

Ganter further contends that even if the police had probable cause, the recovery of the gun was the fruit of an illegal interrogation and should therefore have been suppressed on timely motion. This is basically a claim of deprivation of the constitutional rights as enunciated in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The factual situation here involved is that after the first group of policemen broke into the apartment of Ganter's friend, where Ganter had gone after fleeing the scene, they found Ganter alone in his underwear with bloodstains on him. There is no evidence of any interrogation or questioning of Ganter at this point. The only conversation indicated in the record at this point was that one of the police officers told Ganter "that he had the right to remain silent, that anything he said could be held against him in a court of law. * * * [T]hat he had a right to an attorney while he was being questioned and that if he could not afford an attorney one would be appointed to him by law." At a later time in the hearing on the motion to suppress the officer gave essentially the same version of the warning given to Ganter except that he had said that if he could not afford an attorney one would be appointed for him "by the court."

Ganter contends that he was not adequately advised that he had the right to an attorney at that immediate moment since he was about to be subjected to incustodial interrogation. The argument seems to be that because of the reference to the court-appointed attorney for Ganter there was a Miranda deficiency since there was no judge there to appoint counsel immediately.

There was no indication that Ganter requested an attorney or that he had the idea that ingenious counsel has advanced during the criminal prosecution proceedings.

We cannot agree with the contention that the Miranda warning was inadequate particularly in view of the factual situation in which it was made. The police officers were aware that the man they were seeking had wrested a service revolver from a law officer during an altercation in which blood had been shed and there was now confrontation with the man whom they were seeking at the time of the arrest. It is further to be noted that Ganter took the witness stand during the hearing on the motion to suppress but did not deny any of the police testimony as to the events occurring in the apartment. He did not testify at the trial itself. The warning clearly indicates both that he had a right to remain silent and that he had a right to an attorney during any questioning that might occur.

The more troublesome aspect of the matter we find in the pronouncements of *Miranda*, which do not seem to have been necessitated by the factual situations in any of the cases disposed of by *Miranda*, to the effect that notwithstanding the giving of the Miranda warning the government has a heavy burden of demonstrating that the defendant "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda, supra* at 475, 86 S.Ct. at 1628.

For an excellent summary of the Miranda doctrine as developed to date, *see* United States v. Montos, 421 F.

2d 215, 222, 224 (5th Cir. 1970), cert. den. 397 U.S. 1022, 90 S.Ct. 1262, 25 L. Ed.2d 532 (1970). The voluntary aspect of the waiver may not be presumed simply from the silence of the accused after warnings are given nor simply from the fact that a confession eventually was obtained. However, *Montos* indicates what we believe to be a salutary rule if police investigations are to have any efficacy whatsoever, namely, that an express statement that the individual does not want a lawyer is not required if it appears that the defendant was effectively advised of his rights and he then intelligently and understandingly declined to exercise them.

■ In the case before us we do not have any of the factors which brought about the Miranda doctrine. Within minutes after Ganter was given the Miranda warning, other police officers appeared at the front door of the apartment and the only interrogation that occurred was that Ganter was asked where the gun was. He replied that it was under the couch. There is no indication that the gun was artfully concealed nor that it would not have readily revealed itself to even the most cursory search. Inasmuch as Ganter was without his clothing, he rather obviously did not have the gun on him at the time. Since the first and only inquiry by the police was as to the location of the gun, it is obvious that if he had remained silent a thorough search would have been made of the area of Ganter's immediate control and that as a result of that search the gun, which was nearby under the couch, would have been found.[2] Within minutes after the gun was located Ganter was taken from the apartment and apparently no further interrogation occurred.

We do not conceive that the Supreme Court decisions which have been hammered out in cases such as *Miranda,* in the interest of shaping and preserving basic constitutional rights and privileges, should be construed as being intended to pamper or indulge those whose conduct has run afoul of the legitimate public interest of an ordered society as expressed in our criminal statutes.

■ In holding that no constitutional rights of Ganter were violated at this juncture, we do so on the narrow basis of the facts here involved. The police were in pursuit of a man justifiably believed to be armed and, in view of his threats to a person who had been identified to him as a peace officer, justifiably believed to be dangerous. Blood had been shed. Even the meekest of law violators are known to the police to commit violent acts when cornered. The event of confrontation in the apartment took place in fleeting moments during which the officers nevertheless still gave Miranda warnings but during which there must have been supreme awareness on their part that a strong likelihood existed that a quick movement on the part of Ganter could result in his being armed with a lethal weapon with which he might very well attempt to gain his freedom.

We do not conceive that under these circumstances the natural inquiry as to the location of the gun constituted *Miranda* proscribed interrogation and we so hold.

We believe as stated by the Supreme Court in *Miranda, supra,* 384 U.S. at 477, 86 S.Ct. at 1629, "our decision is not intended to hamper the traditional function of police officers in investigating crime." A contrary result to that which we have here reached would perforce, in our opinion, have a substantially hampering effect.

Our position is further fortified by the record as a whole. Ganter later was at the FBI office and a clearly proper Miranda warning was given to him there and he stated specifically that he desired no counsel. While this was subsequent to the events occurring in the apartment,

---

**2.** A warrantless "search incident to arrest" is justified if the area searched is the area from within which the arrestee might gain possession of a weapon. Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

it indicates that he did desire voluntarily during the afternoon in question to waive his Miranda rights. He had finished two years of high school and should have had the intelligence and education therefore to have comprehended the Miranda warning given by the policemen. Further, he told the FBI agents that he was the individual who had taken the gun and he was identified by an independent distinterested eye witness as the individual who had run down the street being chased by the FBI agent.

We note various elements stressed by the Supreme Court in *Miranda* which were not present in the case before us. There were no elements of inquisitorial interrogation. 384 U.S. at 442, 86 S.Ct. 1602. There is no indication in any manner that he did not wish to be interrogated. *Id.* at 445, 86 S.Ct. 1602. The interrogation practice here was not such as was likely to exert such pressure upon him as to disable him from making a free and rational choice. *Id.* at 464, 86 S.Ct. 1602. Again, there was not lengthy interrogation or incommunicado incarceration. *Id.* at 476, 86 S.Ct. 1602.

For the foregoing reasons the motion to suppress was properly overruled.

## MOTION TO SUPPRESS IN-COURT IDENTIFICATION

The defendant filed a pre-trial motion to suppress any in-court identification testimony by Agent Craig relating to identification of the defendant as the person who committed the alleged offense. The grounds urged by Ganter for the granting of the motion were that (a) the initial identification at the hospital was the result of illegal police procedures in violation of the Fifth and Sixth Amendments and the rule established in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); and (b), apart from *Wade*, the use of the one-man hospital show-up technique violated due process of law, citing United States v. Gilmore, 398 F.2d 679 (7th Cir. 1968).

■ The evidence in the record before this court clearly indicates that the one-man show-up complained of is an improper technique which cannot be condoned. United States v. Wade, *supra*; United States v. Gilmore, *supra*.

■ As was stated in Stovall v. Denno, 388 U.S. 293, 294, 87 S.Ct. 1967, 1968, 18 L.Ed.2d 1199 (1967), the decisions in *Wade* and its companion case, Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), require "the exclusion of identification evidence which is tainted by exhibiting the accused to identifying witnesses before trial in the absence of his counsel * * *." Unless there is a showing of intelligent waiver, the accused's constitutional rights are clearly violated. *Wade, supra*, 388 U.S. at 235 and 237, 87 S.Ct. 1926. There is no indication in the record of waiver as to this matter.

However, in the present case the admissibility of evidence of the lineup itself is not involved. Instead, Ganter's argument is that the circumstances in the conduct of the hospital show-up were so prejudicial as to taint fatally the subsequent in-court identification. In this situation there is no per se rule of exclusion of the courtroom identification. *Wade, supra* at 240, 87 S.Ct. 1926. The Supreme Court adopted in *Wade* the following test which is to be applied in these situations:

" ' [W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt 221 (1959)." *Wade, supra* at 241, 87 S.Ct. at 1939, citing Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ At the hearing below on the motion to suppress, the district judge determined that an independent basis existed for Craig's courtroom identification. This basis was that the agent had observed the defendant both prior to and during the time of the assault. Immediately after the assault the agent was able

to give the police a complete description of the assailant, which description favorably compared with the physical appearance of the defendant. Applying the test announced in *Wade*, we are of the opinion that the agent's observations of the defendant provided an independent basis for the courtroom identification, and that the identification was thus "purged of the primary taint." The decision of this court on this issue is limited to the particular factual situation here involved.

It must also be borne in mind here as to the reasonable likelihood that Craig could have identified the defendant in court, without any reliance on seeing him at the hospital by himself, that Craig was a police officer and that the normal training of such officers includes identification of individuals in a sense not needed by the ordinary lay person.

As to Ganter's second contention, "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it * * *." Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). For the same reasons set forth heretofore, we hold that in the present limited factual situation there was not a violation of the due process guarantees which would warrant reversal.

## MOTION TO SUPPRESS STATEMENT

 During the course of the interview at the FBI office, the defendant told the agents that earlier in the day, at approximately 10:00 a. m., he had taken some "pep pills" which cause one to have hallucinations and become drowsy. Ganter's contention now is that this is sufficient to show that his signed waiver at the FBI office was not intelligently and voluntarily made, and that his oral

statement should therefore have been suppressed.

However, testimony at the hearing on the motion below indicates that at the time of the interview the defendant was not drowsy, nor did he appear abnormal. Rather, the testimony demonstrates that Ganter responded alertly to the questioning and was aware of his situation. This testimony sustains the burden of the government to prove that the waiver was voluntarily and intelligently made.

For the reasons hereinbefore set out in this opinion the judgment of conviction is affirmed.[3]

Affirmed.

---

3. Mr. Ronald P. Alwin of the Chicago bar served as court-appointed counsel for the defendant on this appeal and performed his legal services in a most conscientious and effective manner.