**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James Michael BOTHWELL, Defendant-Appellant.**

No. 71–2320.

United States Court of Appeals, Ninth Circuit.

July 3, 1972.

Richard G. Sherman, Beverly Hills, Cal., for appellant.

Harry D. Steward, U. S. Atty., Robert H. Filsinger, Brian E. Michales, James W. Meyers, Stephen G. Nelson, Asst. U. S. Attys., San Diego, Cal., for appellee.

Before HAMLEY, BROWNING and CHOY, Circuit Judges.

HAMLEY, Circuit Judge:

James Michael Bothwell appeals his conviction of smuggling and transporting marijuana, in violation of 21 U.S.C. § 176a. On appeal, defendant's sole contention is that the in-court identification of defendant by Special Agent Prentice N. White was tainted by a prior identification of defendant obtained in violation of the lineup rule announced in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Defendant's objection on this ground was timely raised at the trial, and was overruled.

The taint, according to defendant, results from a one-man showup of defendant before Agent White on the evening of April 16, 1970. Since this was prior to the indictment, which was returned on April 22, 1970, the *Wade* rule, to the effect that police conduct of a post-indictment pretrial lineup without notice to and in the absence of counsel denies the accused his Sixth Amendment rights to counsel is not applicable. *See* Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

But defendant's argument, in the trial court and on appeal, is broader than the *Wade* pronouncement against the conduct of a police lineup in the absence of counsel. He invokes, in addition, the principle, recognized in *Wade* and other cases, that even under circumstances where the Sixth Amendment right to counsel would not render a police lineup or one-man showup improper, the confrontation may be so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny the accused due process of law under the Fifth Amendment. Appellate appraisal of this contention calls for a review of the "totality of the circumstances" under which the lineup or showup occurred. Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). *See* Simmons v. United States,

390 U.S. 377, 384, 88 S.Ct. 967, 19 L. Ed.2d 1247 (1968).

Customs Inspector Patrick Arthur Vaughan was on duty at the United States-Mexico Port of Entry, at Tecate, California, at 8:30 p. m., April 7, 1970. At that time and place a 1965 black Chevrolet El Camino automobile, with a driver as the sole occupant, entered the United States from Mexico. Vaughan talked with the driver, inspected the vehicle, and then permitted the entry. At the trial, Vaughan identified defendant as the driver of the El Camino on this occasion.

Later that evening Clarence Feely, an investigator with the United States Immigration Service, discovered several burlap bags concealed about two hundred yards from the Mexican border, near Potrero, California. The United States Customs Service was alerted and took over the investigation. Special Customs Agent Prentice N. White visited the location about 10:30 p. m. that night, determined that the bags contained several kilo-bricks of what was apparently marijuana, and set up surveillance of the "cache."

White concealed himself about one hundred feet from the cache. It was a clear and starlit night and there was also some light from street lamps on the Mexican side of the border. About 3:30 a. m., April 8, 1970, White saw a vehicle approach the cache rapidly along Thing Road. It was a black El Camino. The driver was the only occupant. Observing with high-powered binoculars, White noted that the driver, who busied himself placing the bags in the automobile was exceptionally tall—six feet six or taller—and thin in proportion to his height. While White could not see this man's facial features he observed that he was blond and that his hair was nearly shoulder length. The man was wearing a light-colored leather or suede jacket about hip length and dark trousers.

After this man left in the El Camino, other Customs agents gave chase, but were out-distanced by the El Camino. They finally found this vehicle abandoned, and noted footprints leading into a mountainous area in the direction of Mexico. Eight burlap bags containing two hundred and four kilogram packages of marijuana were found in the vehicle. After the marijuana had been removed, the car had been dusted for fingerprints, and documents found in the vehicle had been examined, the vehicle was driven to the Tecate Port of Entry where it was parked alongside the Customs House. Inspector Vaughan saw it there about 8:00 or 9:00 a. m., April 8, 1970. Someone told Vaughan at that time that the El Camino had been seized early that morning, with a load of marijuana. Vaughan was not then given a description of the driver.

From the documents found in the vehicle, White ascertained that it had been purchased from a couple residing near San Diego. White called on this couple and learned that the car had been sold to a somewhat short man with long, dark hair, and a moustache. Eight days later, on April 16, 1970, White had a conversation with Officer Jaffee of the San Diego Police Department who handled narcotics cases. When Jaffee heard White's description of the driver of the El Camino, and the purchaser of that car, he remembered that these descriptions coincided with those of two individuals involved in some of Jaffee's narcotics investigations.

Jaffee then gave White the names of the individuals he had in mind—James Michael Bothwell and Charles Fred Nelson. The physical description of Bothwell which Jaffee supplied corresponded with White's mental picture of the El Camino driver. Jaffee also supplied White with photographs showing the faces of these two men. The style of hair and its color reminded White of the El Camino driver.

In the meantime, about 5:30 p. m. the same evening (April 16, 1970), while Vaughan was again on duty at the Te-

cate Port of Entry, a 1957 Chevrolet white pickup, with the driver as the only occupant, entered the port from Mexico. Vaughan immediately recognized the driver as the driver of the El Camino which entered and left this Port of Entry on the evening of April 7, 1970.

With his information that the El Camino had been seized on April 8, 1970, with a load of marijuana, Vaughan suspected that the Customs service might be looking for the driver of the 1957 Chevrolet pickup. Vaughan therefore telephoned White who had just returned to his home from his conversation with Jaffee. When White learned that Vaughan had the driver of the El Camino, and heard Vaughan's general description of this man, White told Vaughan that he would call him back in a few minutes. White then telephoned Harry McCue, who was in charge of the Complaints Section of the United States Attorney's office and obtained authority to arrest the driver of the 1957 Chevrolet pickup. White then telephoned Vaughan and asked him to arrest that driver.

Vaughan made the arrest, and White went immediately to the Port of Entry to take custody of the man arrested. In actuality, Special Agent Thaine A. Ellis took custody of this individual before White arrived but, upon arrival, White took joint custody. Before reaching the Port of Entry, White suspected that the man Vaughan had arrested was the El Camino driver who had picked up the burlap bags, but he did not have a firm opinion as to this until he actually saw this driver, sitting alone in the Customs House office. White then immediately recognized the man as the driver of the El Camino.

Under the circumstances described above we conclude this so-called one-man showup was not so unnecessarily suggestive and conducive to irreparable mistaken identification as to render White's in-court identification of defendant a de-nial of due process of law. This was not the usual police lineup or showup routine, wherein a victim or lay witness is asked to identify a suspect. The "witness" who observed defendant at the Port of Entry was an experienced law enforcement official, trained in identification procedures, actively engaged in the investigation of the crime in question.

Agent White had been engaged in such investigative and identification procedures for eleven years, involving hundreds of cases, and was thoroughly trained in the art of identifying individuals through observation of their physical features. The courts have accorded deference to the special identification training and abilities possessed by law enforcement officers. See United States v. Kilgore, 418 F.2d 225, 226 (9th Cir. 1969); United States v. Ganter, 436 F. 2d 364, 372 (7th Cir. 1970); United States v. Cox, 428 F.2d 683, 686 (7th Cir. 1970).

White went to the Port of Entry on April 16 primarily to take custody of the man Vaughan had arrested. It would have been impracticable to stage a normal police lineup at the Port of Entry, with several exceedingly tall thin blond men with long hair, for White to view.

It is true that, when he saw defendant there for the first time at close range he immediately identified him as the person who had picked up the burlap bags. But, in view of White's special training and experience, it is altogether likely that he would have similarly selected defendant from a regular lineup, had one been arranged.

We conclude that, under the circumstances of this case, there was no impairment of defendant's due process rights because White's in-court identification of defendant was preceded by the described one-man confrontation at the Port of Entry.

Affirmed.