**Don Lee HANCOCK, Appellant,**

v.

**Lewis TOLLETT, Warden, Appellee.**

**No. 20873.**

United States Court of Appeals,
Sixth Circuit.

Sept. 8, 1971.

W. Clyde Russell (court appointed), Greeneville, Tenn., for appellant on brief.

R. Jackson Rose, Asst. Atty. Gen., Nashville, Tenn., David M. Pack, Atty. Gen., of counsel, for appellee on brief.

Before BROOKS and MILLER, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

O'SULLIVAN, Senior Circuit Judge.

Petitioner-appellant, Don Lee Hancock, a prisoner of the State of Tennessee, appeals from denial, without evidentiary hearing, of his petition to a United States District Judge for a writ of habeas corpus. Petitioner, in July of 1967, had been convicted of armed rob-

bery, upon trial in the Circuit Court of Bedford County, Tennessee. At trial and on appeal to the Court of Criminal Appeals of Tennessee, appellant objected to the prosecution's use of an in-court identification of him by two witnesses. He charged that such identification was the product of an improper one-man confrontation or showup. The District Judge denied relief without an evidentiary hearing, holding that the state appellate court determination, evidenced by a written opinion, was presumed correct and that appellant had not established any of the circumstances set forth in 28 U.S.C. § 2254(d) (1)–(8) which require an evidentiary hearing. His conviction was affirmed by the Court of Criminal Appeals and his application for certiorari was denied by the Supreme Court of Tennessee on August 5, 1968. Certiorari was denied by the Supreme Court of the United States. Hancock v. Tennessee, 394 U.S. 951, 89 S.Ct. 1291, 22 L.Ed.2d 486 (1969), Mr. Justice Douglas dissenting, 394 U.S. 1008, 89 S.Ct. 1597, 22 L.Ed.2d 789.[1]

We affirm.

Understanding will be served by recital of pertinent portions of the state court opinion upon which the District Judge relied.

"On August 1, 1966 Scotty Brandon, twelve years of age, was working for the Tennessee Amusement Company as a ticket seller at the Highway 41 Drive-In Theatre, located just outside of Shelbyville on the highway between that city and Tullahoma. His eleven year old brother Steven was there to keep him company. The ticket booth was located near the drive-in entrance to the theatre, and was well lighted inside and out. About 9:00 o'clock that night Scotty counted his money; he had $122, put

$50 in the money bag and $72 in the money box, and was standing outside the booth at the ticket window when two men approached him. Asked if they would like to see the show, one of them replied affirmatively and inquired if they could get in on foot. He informed them that they could and turned around to get the tickets. One of the men placed a small pistol against his side, told him to get inside and pushed him through the door into the ticket booth. This man then told Steven Brandon to give him the money bag, Steven did so, and the man grabbed the money box, and told the boys to stay inside, that there was a man across the street with a rifle who would shoot them if they tried to leave. The robbers left and ran up the highway toward Tullahoma.

"Scotty described the man with the gun as 'just a little bit shorter than Mr. Newman (the Sheriff), and he had real long—he had long black bushy hair, and well, he weighed about 150 or 160 pounds'; that he had on blue jeans with bleached spots in them and a shirt with red, black and white checks in it; that he was about twenty or twenty-one or twenty-two years old; and that the other man had long brown bushy hair and looked to be twenty-one or twenty-two years old. Steven described the man with the gun as having long black bushy hair, wearing blue jeans that looked like they had bleached spots in them, and a checkered shirt that had blue and red in it, and said defendant's hair at trial was shorter and a lighter color than at the time of the robbery; and that he did not get a good look at the other man.

"With reference to the confrontation of these boys with the defendant at the jail in Murfreesboro, to all of which defense counsel's objections were overruled by

---

1. Petitioner, while in jail after his apprehension for an armed robbery committed on August 10, 1966, escaped. While being recaptured, he shot and killed a highway patrolman, for which he was convicted of murder in the first degree. His conviction for this killing was affirmed by the Court of Criminal Appeals on February 17, 1968. The Supreme Court of Tennessee denied his application for a writ of certiorari on September 4, 1968. Apparently, however, Hancock has not yet employed habeas corpus in the United States courts to assert some constitutional vice in his conviction for murder.

the court, Scotty testified that eight or ten days after the robbery he and Steven and their father, along with Shelbyville Chief of Police Roy Fann and a Mr. Ogles, went to the Murfreesboro Jail 'to look at a man and see if he was the one that robbed us'; that they went upstairs to the hall in front of the cells, and a trusty had the defendant come out of his cell into the hallway, after all of them had first looked at him through a little window; that he then recognized him as the man who held the gun on him and robbed him at the drive-in theatre; that 'he was a little shorter than Mr. Newman, and his hair was still black and long, and he weighed about 150 or 160 pounds.' He said he did not know the defendant's name until after he had identified him, and that his father told him his name was Donald Lee Hancock. He identified the defendant in court, and said that that was the only time he had seen him between the robbery and the trial, and that 'his hair is cut shorter and it's brown.' He testified that the trip to the Murfreesboro Jail was suggested to his father by Shelbyville Police Chief Roy Fann, and that 'My father told me we were going over to look at some—to look at a man and see if he was the one that robbed us'; that no one told him they were going to look at Donald Hancock; that they only looked at this one man at the Murfreesboro Jail; that he was brought out into the hallway at the suggestion of the Sheriff of Rutherford County; that after he and his brother had looked at the defendant, 'I said That's him.' Then, Mr. Fann asked my brother was that him, and he said, 'Yes'; and that he based his in-court identification of the defendant upon his identification of him at the Murfreesboro Jail.

"Defense counsel's objection to the testimony of Steven Brandon about the identification of the defendant at the Murfreesboro Jail was also overruled. Steven testified that by pre-arrangement they were to nod their head if they recognized the man; that after the defendant was brought out in the hall he and Scotty nodded their heads to Mr. Fann, and that the defendant was then taken back to his cell; that when they got to the jail, Mr. Fann said, 'We would like to see Don to see if they can identify him and look at him'; or 'We would like to identify—I mean, see—We would like to see Donald Hancock'; that when he and his brother and father and the others went to the Murfreesboro Jail, they were going to see Don, and that Mr. Fann had told all of them that they were going over to Murfreesboro to see Don; that when they saw the defendant in the jail he was dressed in his undershorts; and that he did not notice any tattoo markings on the defendant. He identified the defendant in court, and said he was the same man he saw in jail in Murfreesboro.

"The defendant testified that he was not in any way involved in the robbery, and did not hear about it until he was locked up on August 10th in the Bedford County Jail; that he was transferred from the Bedford County Jail to the State Prison in Nashville on August 11th and stayed there in the hospital three weeks; that then he was returned to Shelbyville for a hearing and was then placed in jail in Murfreesboro about the 26th of August; that while in the Murfreesboro Jail the trusty came to his cell and asked him to come out in the hallway, saying that somebody wanted to see him, and that he thought it was his attorney coming there to talk to him, and that he was dressed in his undershorts and a tee shirt; that after the boys and the others looked at him he was returned to his cell. He testified with reference to the tattoos on his hands and arms; that he was alone in the hallway when the Brandon boys and the others with them looked at him; that his hair on August 1st was the same color as it was in court, sandy brown, that it might have been a little longer then than at present, that his hair was not black then and was no darker than at the time he testified.

"Of course, the core of the complaint raised by the first Assignment of Error is that the in-court identification of the

defendant by the Brandon boys was based upon and tainted by their pre-trial identification while he was in jail. According to these boys, this jail identification was eight or ten days after the robbery on August 1, 1966. The defendant was arrested for armed robbery in Shelbyville, Tennessee on August 10, 1966 and was placed in the Bedford County Jail. He escaped the next day and while being recaptured he shot and killed a highway patrolman and was wounded himself. He says he was then hospitalized three weeks in the State Penitentiary at Nashville and was placed in the Murfreesboro Jail about August 26th. At any rate, he was in that jail awaiting trial upon a charge of first degree murder, for which he was tried and convicted in Marshall County, after a change of venue, on January 31, 1967. Thus, the confrontation in the jail occurred during August of 1966, making inapplicable because of their nonretroactivity the cases of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926 [18 L.Ed.2d 1149], and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951 [18 L.Ed.2d 1178], both decided June 12, 1967. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967 [18 L.Ed.2d 1199] (June 12, 1967). "In Stovall v. Denno, supra, after holding that *Wade* and *Gilbert* could not be given retroactive effect, the Court continued:

" 'We turn now to the question whether petitioner, although not entitled to the application of *Wade* and *Gilbert* to his case, is entitled to relief on his claim that in any event the confrontation conducted in this case was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law. This is a recognized ground of attack upon a conviction independent of any right to counsel claim. Palmer v. Peyton, 359 F.2d 199 (C.A. 4th Cir. 1966). The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned. However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it, and the record in the present case reveals that the showing of Stovall to Mrs. Behrendt in an immediate hospital confrontation was imperative. The Court of Appeals, *en banc*, stated, 355 F.2d [731] at 735,

" 'Here was the only person in the world who could possibly exonerate Stovall. Her words, and only her words, 'He is not the man' could have resulted in freedom for Stovall. The Hospital was not far distant from the courthouse and jail. No one knew how long Mrs. Behrendt might live. Faced with the responsibility of identifying the attacker, with the need for immediate action and with the knowledge that Mrs. Behrendt could not visit the jail, the police followed the only feasible procedure and took Stovall to the hospital room. Under these circumstances, the usual police station line-up, which Stovall now argues he should have had, was out of the question.'

"There was no such urgency or emergency in this case. No reason is shown or suggested, and we perceive none, for taking the perilous risk of presenting only the defendant to the Brandon boys at the Murfreesboro Jail, or why the normal and customary line-up procedure was not employed at this critical identification confrontation.

"Nevertheless, 'A claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it.' Stovall v. Denno, supra. Here, these boys' original meeting with the defendant was a memorable one. They watched the two robbers approach the ticket booth; they saw one of them draw a gun and hold it against Scotty Brandon's side and force him inside where he made Steven hand over the money bag and grabbed up the money box, and told them a man across the street with a rifle would shoot them if they tried to leave the ticket booth; this one of the robbers the boys had particularly good

opportunity to observe and good reason to remember; their descriptions of him, while not in complete accord, were substantially the same. Although there is conflict in their testimony as to the way and manner by which they were to and did indicate recognition of the man at the jail and as to whether they were told the defendant's name before or after they saw and recognized him there, and although they were accompanied to the jail by their father and the Shelbyville Police Chief and another man, we cannot say upon this record that they were coached or pre-conditioned or influenced corruptly by suggestion or otherwise to point the finger of guilt at the defendant and identify him as one of the robbers, nor that their testimony was not entitled to the weight which the jury manifestly accorded to it. We hold, in view of the totality of the circumstances exhibited in this record, that none of the defendant's constitutional rights, state or federal, were encroached upon in his identification at the jail or by admission of evidence with reference thereto; and that the in-court identification of the defendant by the Brandon boys was not, therefore, the fruit of a tainted or corrupt pre-trial identification."

The legality of Hancock's identification and testimony thereof must be judged by the rule of Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). There the Supreme Court decided that pre-trial identifications conducted before its decisions in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S. Ct. 1951, 18 L.Ed.2d 1178 (1967)—such as the identification involved here— would be governed by due process standards and not by retroactive application of the *Wade* and *Gilbert* decisions. Under *Stovall,* the test is whether "on the totality of the circumstances" surrounding the confrontation it was "so unnecessarily suggestive and conducive to irreparable mistaken identification," as to violate due process. It was made clear in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), that the *Stovall* rule means that a particular identification process must be more than somewhat suggestive and will be set aside only if "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384, 88 S.Ct. at 971.

One-man showups have not been adjudged a per se violation of due process. They have been condemned as suggestive, but whether a particular showup and identification violates due process is dependent on the "totality of the circumstances." The particular concern of the courts is whether the showup has produced reliable identification evidence or the likelihood of misidentification.

Cases finding that a particular showup did violate due process set out additional facts beyond that of the one-man factor itself, which pointed towards the unreliability of the identification. See Foster v. California, 394 U.S. 440, 89 S. Ct. 1127, 22 L.Ed.2d 402 (1969); Palmer v. Peyton, 359 F.2d 199 (4th Cir. 1966); United States v. Gilmore, 398 F.2d 679 (7th Cir. 1968). In our recent decision of Biggers v. Neil, Warden, 448 F.2d 91 (1971), we held that identification by a rape victim of her alleged assailant was "so essentially unfair as to represent a deprivation of appellant's [the alleged rapist] federal constitutional right to due process of law." The facts of that case, however, make clear that it is not controlling here. We said,

"The evidence clearly shows that the complaining witness did not get an opportunity to obtain a good view of the suspect during the commission of the crime. Also, the show-up confrontation was not conducted near the time of the alleged crime, but, rather, some seven months after its commission. Finally the witness in the instant case was unable to give either an independent photographic identification of the suspect or a good physical description of her assailant. The nature of the showup as conducted in this case— with the great lapse of time between

**1328**

the crime and the identification, the hesitancy of the witness in identifying the petitioner, the circumstances of the stationhouse confrontation coupled with Mrs. Beamer's knowledge that petitioner was thought by police to be her assailant—tended to maximize the possibility of misidentification of the petitioner."

We consider that the facts recited in the Tennessee state court, set out above, present such dissimilarity from the facts of our *Biggers* case to warrant our conclusion to affirm. We emphasize that the boys who were robbed had good opportunity to view the robbers in a well lighted area. The event must have left a memorable impression. Their early descriptions of the robber with the gun were substantially the same and coincided with the appearance of appellant at the jail. Their identification of appellant was unequivocal and without apparent hesitation.

We affirm.