UNITED STATES of America ex rel.
Robert J. RAYMOND, Petitioner-
Appellant,

v.

PEOPLE OF the STATE OF ILLINOIS,
Respondent-Appellee.

No. 71-1330.

United States Court of Appeals,
Seventh Circuit.

Dec. 10, 1971.

Rehearing Denied Jan. 24, 1972.

Hastings, Senior Circuit Judge, dissented and filed opinion.

Pell, Circuit Judge, dissented in part and concurred in part and filed opinion.

Terrence K. Hegarty, Chicago, Ill., for petitioner-appellant.

Melbourne A. Noel, Asst. Atty. Gen., Chicago, Ill., for respondent-appellee.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and PELL, Circuit Judge.

SWYGERT, Chief Judge.

This is an appeal from the denial of appellant's petition for a writ of habeas corpus. Appellant, Robert J. Raymond, is imprisoned at the Illinois State Penitentiary pursuant to a conviction for rape and robbery. On July 26, 1962 the Circuit Court of Cook County sentenced him to concurrent terms of 20 to 40 years for rape and 15 to 20 years for robbery. The Illinois Appellate Court affirmed these convictions on March 24, 1965, People v. Raymond, 57 Ill.App.2d 292, 206 N.E.2d 740 (1965). Post-conviction relief was denied by the Circuit Court of Cook County on June 8, 1967 and that denial was upheld by the Supreme Court of Illinois on June 20, 1969, People v. Raymond, 42 Ill.2d 564, 248 N.E.2d 663 (1969).

Appellant filed a petition for a writ of habeas corpus on June 2, 1970 challenging the constitutionality of his conviction on two grounds: Raymond claims that he was denied due process of law by the state's use of identification procedures that were unnecessarily suggestive and conducive to irreparable mistaken identification and by the state's failure to disclose to the defense attorney material evidence favorable to the accused. The judgment of conviction is reversed. As to Raymond's second argument, Judge Pell and I agree that the nondisclosure of the result of the laboratory test to counsel for defendant requires reversal. However, I alone agree with Raymond's argument that the particular identification procedures used here constitute an alternative ground for reversal of the conviction.

The crime for which Raymond was convicted was alleged to have occurred at 6:00 p. m. on November 16, 1961.

Mrs. Virgie Barger, a white woman, 58-years-old at the time, was walking down the street when a young, Negro man grabbed her, took three dollars from her purse and after dragging her into a nearby gangway, raped her. Apart from the victim and her attacker, there were no witnesses to the incident.

Police officer Mallder arrived at 6:10 and escorted Mrs. Barger to her apartment three blocks away. Mrs. Barger gave the officer a description of her attacker which he sent to the Central Communications room after 6:15.

Between 6:10 and 6:15 Raymond was arrested for an unrelated crime approximately five blocks from the scene of the rape. En route to the station house, the arresting officer heard the description of Mrs. Barger's assailant over the police radio and immediately brought Raymond to Mrs. Barger's apartment. Raymond, in handcuffs and accompanied by six uniformed policemen, confronted Mrs. Barger twice between 6:20 and 6:30. Mrs. Barger did not identify him at this time. Between 8:00 and 8:30 at the station house later that evening, Raymond, wearing the same clothes he wore when arrested, took part in a lineup of eight men. At this point, Mrs. Barger identified him as her assailant. The defendant points to these procedures —two "showups"[1] immediately after the alleged crime followed two hours later by a lineup—as constituting a violation of due process.

Defendant's second claim refers to a police laboratory test for spermatozoa made on Raymond's sweater, pants, and undershorts at 9:30 p. m. the evening of his arrest. On the following day the police station commander reported the results to Raymond saying, "The results of the test on your clothing came back and proved negative but that don't clear you." Raymond's attorney did not hear of this report until after his client had been found guilty. The state introduced the report only at the sentencing hearing following the trial.

I

The standard to be applied in judging a due process claim involving pretrial identification procedures derives from Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). While the Court in *Stovall* refused to give retroactive application to the rule announced in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), requiring counsel at pretrial identification confrontations, it did present as an alternative ground of attack the claim that the identification procedures were "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." 388 U.S. at 302, 87 S.Ct. at 1972. Defendant claims that the identification procedures used here fall under this standard either because of the holding of a showup immediately after the crime or because of the combined use of two showups and a lineup within two hours of each other.

The showup in the instant case can be supported under *Stovall*. In *Stovall*, the Court held that while "the practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned," any particular claimed violation of due process must depend on the "totality of circumstances surrounding it." 388 U.S. at 302, 87 S.Ct. at 1972. The circumstances considered there pointed to the necessity for the showup where formal lineup procedures would have been impractical: Since the only witness was in the hospital in imminent danger of dying, a direct confrontation between the witness and her alleged assailant was the only "feasible" procedure. Showups have been sustained in

---

[1]. A showup can be described as a "single suspect [confrontation] wherein a witness is presented with one individual and asked if he can make an identification." United States v. Clark, 294 F.Supp. 44, 49 (D. D.C.1968).

other situations when the state's interest in an expeditious identification could be shown, as in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L. Ed.2d 1247 (1967), where the defendant's photo was presented to witnesses the day after a serious felony had been committed when the memory of the incident was still fresh and while the perpetrators remained at large, or in Bates v. United States, 132 U.S.App.D.C. 36, 405 F.2d 1104 (D.C.Cir. 1968), where the defendant was apprehended shortly after the crime and returned to the scene of the crime to confront the complaining witnesses. *See* Wise v. United States, 383 F.2d 206 (D.C.Cir. 1967), cert. denied, 390 U.S. 964, 88 S.Ct. 1069, 19 L. Ed.2d 1164 (1968); Harris v. Dees, 421 F.2d 1079 (5th Cir. 1970); *cf.* United States v. Gilmore, 398 F.2d 679 (7th Cir. 1968). In the instant case, where there were two reports of attacks in the same five block area, within fifteen minutes of each other, the police sought to determine quickly if they had apprehended the right man, and an immediate showup twenty minutes after the crime, rather than a formal lineup, was justified.

But this determination is not dispositive since the showup alone did not yield an identification of Raymond as Mrs. Barger's assailant; it is the combination of procedures—two showups and a lineup—that finally resulted in a positive identification. However justified a single showup or a single lineup is at the outset, the rationale of *Stovall* suggests that they are alternative procedures. Their use in combination is highly suspect. In Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1968), the complaining witness observed a police station lineup involving three men—the defendant, who was approximately six feet tall, and two very much shorter men. The witness could not identify the defendant at this time

and instead asked to speak to him. A one-to-one confrontation was immediately arranged, but the witness remained uncertain. About a week later, at a second lineup in which the defendant was the only person who had also appeared in the first, the witness was "convinced" that the defendant was the robber. The Court found that the pretrial identification evidence was inadmissible on the ground that "the pretrial confrontations clearly were so arranged as to make the resulting identifications virtually inevitable." 394 U.S. at 443, 89 S.Ct. at 1129.

The facts of the instant case fit even more squarely under the ruling of *Foster.* The identification procedures began with a one-to-one showup which, as *Stovall* states, is itself a highly suggestive procedure. 388 U.S. at 302, 87 S.Ct. at 1967. The defendant, handcuffed and accompanied by six uniformed policemen, confronted Mrs. Barger at her apartment twenty minutes after the alleged crime, wearing the same leather jacket and brim hat that had fit the description she had given of her assailant. The witness did not identify him at this time, nor did she ask to see him again as the complaining witness in *Foster* had. The lineup held only two hours later at the police station was solely at the police's initiation. Furthermore, there is some dispute as to whether Raymond was the only man in the lineup wearing a leather jacket and brim hat. It is clear that he was wearing the very same clothes he had worn at the confrontation with the plaintiff a short time before, and that he was the only member of the lineup to have participated in a prior showup. I believe that these procedures "so undermined the reliability of the eyewitness identification as to violate due process." [2] Foster v. California, *supra* at 443, 89 S.Ct. at 1129.

2. Several cases have upheld showup-lineup combinations where the initial encounter was justified under *Stovall* and yielded an identification of the suspect at the outset. *E. g.*, United States v. DeLeo, 422 F.2d 487 (1st Cir. 1970); United States ex rel. Garcia v. Follette, 417 F.2d 709 (2d Cir. 1969).

The instant case can be compared to cases attacking the conduct of lineups when police officers have in some way drawn attention to the suspect during the lineup. *E. g.,* United States ex rel. Stevenson v. Mancusi, 409 F.2d 801 (2d Cir. 1969).[3] In *Wade* for example, several witnesses testified that they saw the suspect through an open door outside the courtroom before he was joined by other prisoners and before the lineup formally began. Indeed, the finding in *Wade* that lineups require the presence of a lawyer was based in part on the conclusion that lawyers could help prevent those practices whose net effect was to turn a lineup into a showup. 388 U.S. at 236, 87 S.Ct. at 1926. In this case, practices similar to those which the *Wade* rule is henceforth to deter did occur. Where the showup was held only two hours before the lineup, the lineup can hardly be seen as a fair or objective proceeding.

Nor can I find, in considering the "totality of circumstances" surrounding this case, any showing of state necessity that may justify holding a lineup immediately after a showup. The state stresses the fact that Mrs. Barger was hysterical at the showup. It appears to be claiming either that since her first encounter with the defendant was inconclusive, police efficiency required a second, or that the procedures were not prejudicial since Mrs. Barger's condition in some way eradicated all memory of the previous confrontation. It is not at all clear that Mrs. Barger was hysterical: She was sufficiently in control to give the police a detailed description of her assailant. She was sufficiently in control so that the police officers thought a showup could be immediately fruitful to determine if their investigation was on the right track. Moreover, unlike the justification offered for a showup immediately following commission of a crime, there is no legitimate state interest in securing a positive identification that can be held to override the prejudice of these procedures. In Palmer v. Peyton, 359 F.2d 199, 202 (4th Cir. 1966), which is cited approvingly in *Stovall,* the court holds that the state may not "rely on an identification secured by a process in which the search for truth is made secondary to the quest for a conviction."

I hold that the conduct of the pretrial identification procedure violated appellant's constitutional rights and that the resultant evidence was inadmissible at trial. Moreover, the state did not offer sufficient independent corroborative evidence to justify admitting Mrs. Barger's in-court identification of Raymond. *E. g.,* Wright v. United States, 131 U.S. App.D.C. 279, 404 F.2d 1256, 1261 (D.C. Cir. 1968); Frazier v. United States, 136 U.S.App.D.C. 180, 419 F.2d 1161 (D.C.Cir. 1969). The incident in question took place at dusk. Mrs. Barger was a 58-year-old woman who had been surprised by her attacker and dragged on her back into the nearby gangway. Where the witness' powers of observation are in doubt to that extent it cannot be said that the in-court identification "had a source sufficiently independent of the [pretrial identifications] to be

---

In this case, Mrs. Barger did not identify Raymond at the initial showup and thus the danger of suggestion resulting from subsequent encounters with the defendant was exacerbated.

3. In United States v. Wade, *supra* at 233, 87 S.Ct. at 1935–1936, the Court reviewed several state court decisions describing the numerous ways in which police single out their suspect during lineups, for example, where "all in the lineup but the suspect were known to the identifying witness . . . the other participants in a lineup were grossly dissimilar in appearance to the suspect . . . only the suspect was required to wear distinctive clothing which the culprit allegedly wore . . . the witness is told by the police that they have caught the culprit after which the defendant is brought before the witness alone or is viewed in jail . . . the suspect is pointed out before or during a lineup, and . . . the participants in the lineup are asked to try on an article of clothing which fits only the suspect."

free from [their] taint." Frazier v. United States, *supra* at 1170.

## II

■ Defendant's second claim relates to the state's failure to disclose the results of a laboratory test on defendant's clothing to the defense attorney. At oral argument, the state conceded a duty to disclose this information, but contended that the duty was wholly fulfilled by disclosure to the defendant rather than to the defense counsel.

This is a case of first impression. Cases dealing with the state's duty of disclosure consider the scope of disclosure—the kinds of information that must be disclosed and the circumstances triggering that duty—and not the party to whom the information is to be given.[4] In each case, the contours of the state's responsibility to disclose are determined by considering what the defense counsel needs to know in order to insure a fair trial. The test of what evidence has to be revealed is such that the only reasonable recipient of that information is the defense attorney. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed.2d 215 (1962) held that the prosecution's nondisclosure of evidence violated due process where that evidence is "material either to guilt or to punishment." The court's rationale was stated simply: "Society wins not only when the guilty are convicted but when *criminal trials* are fair . . ." 373 U.S. at 87, 83 S.Ct. at 1197 (emphasis added). Barbee v. Warden, Maryland Penitentiary, 331 F.2d 842 (4th Cir. 1964), extended the *Brady* rule, holding that the state's duty was not dependent on the diligence of counsel in requesting the evidence in question: "In gauging the nondisclosure in terms of due process, the focus must be on the essential fairness of the procedure and not on the astuteness of *either counsel.*" 331 F.2d at 846 (emphasis added).[5]

If there is a duty to disclose in the instant case—as the state admits—it can only be grounded in the importance of the evidence to the defense's case at trial. To then maintain that the state's duty is fulfilled before that information is squarely in the hands of the defense counsel is wholly inconsistent.

The state's argument implies either an additional burden on the attorney to ask the defendant for any information which the state may or may not have disclosed,

4. The case of United States ex rel. Thompson v. Dye, 221 F.2d 763 (3d Cir. 1955), upon which the state principally relies, involves the scope of the prosecution's duty of disclosure only. The state quotes the principle reaffirmed in *Dye* that "[e]vidence is not suppressed or withheld if the accused has knowledge of the facts and circumstances or if they otherwise become available to him during trial." 221 F.2d at 767. That principle refers to the court's concern that disclosure be used to equalize the resources of the defense counsel and the prosecutor, and thus that the defense attorney be given access only to information that would be beyond his competence to obtain in the ordinary course of criminal discovery. Where the information at issue consisted of statements made by one of the arresting officers to the prosecutor, the court concluded that "[h]ad the defense trial lawyer been without peer as an advocate he still could hardly have been held to putting the second arresting officer on the stand where there was every reasonable

expectation that his story would dovetail with what [the other arresting officer] had said." 221 F.2d at 768. In Hayes v. Wainwright, 302 F.Supp. 716 (1969), the court found no due process violation since the undisclosed information involved "evidence" of self defense that had been related to the sheriff by the defendant and was clearly within the attorney's competence to discover. In the instant case, the results of police laboratory tests are conceded to fall within the scope of the prosecution's duty of disclosure; the remaining question is whether that duty was discharged by disclosure to the defendant.

5. Levin v. Katzenbach, 363 F.2d 287 (1966), extends the prosecution's duty of disclosure even beyond that defined in Barbee v. Warden, *supra*, to include evidence that was discoverable through due diligence on the part of defense counsel. 363 F.2d 287 (1966). *See* Giles v. Maryland, 386 U.S. 66, 100, 87 S.Ct. 793, 17 L.Ed.2d 737 (1966) (concurring opinion).

or alternatively, on the defendant himself to disclose that information to his attorney. We can find no support for either contention. The state's duty to disclose which is not to be conditioned on the defense attorney's request for information from the prosecution, Barbee Warden, *supra,* Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287 (D. C.Cir. 1966), cannot now give rise to a new burden on defense counsel to specifically request that information from the defendant.

The state principally emphasizes the defendant's choice in withholding this information or in furnishing it to his attorney.[6] Where the items involved are material to an accused's defense at trial, and are, as in this case, technical data uniquely in the possession of the police, there can be no informed choice on the part of the defendant. The state's argument implies that fulfillment of the duty to disclose, which was triggered by the significance of the state's information to the defendant's case whether or not specifically requested by "astute" counsel, would rely finally on the "astuteness" of the defendant in using the information to its best advantage.

We cannot agree that the state's duty to disclose evidence, as required by due process, can be discharged by disclosure to the defendant rather than to the defense counsel.

The district court's denial of defendant's petition is reversed and the cause is remanded to the district court for further proceedings.

HASTINGS, Senior Circuit Judge (dissenting).

Because of my serious concern with the result reached by the majority in this case, I have made a meticulous study of the transcript of the evidence in this case as it was tried to a jury in the Criminal Court of Cook County, Illinois, beginning June 26, 1962 and concluding July 2, 1962 with a jury verdict finding defendant Robert Raymond guilty of robbery and guilty of rape. After this study of the record and the evidence in the Illinois state court proceeding, I am convinced that the conclusions reached by the majority will result in a grave miscarriage of justice to society. My conclusions require a more comprehensive statement of the facts than is apparent from the majority opinion.

I

The prosecuting witness, Virgie Barger, age 58, at the time of the alleged robbery and rape on November 16, 1961, resided in an upstairs apartment at 1753 E. 67th Street, Chicago, Illinois. She had been a widow for nine years, was the mother of three children and the grandmother of six grandchildren. She had worked at her usual place of employment from 8:00 a. m. to 4:10 p. m. that day. Leaving work she walked to a grocery store about five blocks from her residence where she did some shopping and left there about 5:40 p. m. She was walking north on the sidewalk on the east side of Ridgeland Street between 67th and 68th Streets on her way home. She reached a point about one block from her home around 6:00 p. m. It was dusk, the street lights were lighted and the nearest street light was about ten feet from the point of the alleged crime.

At this point, the assailant, later determined to be the petitioner, Robert

---

6. The state emphasizes the use of the word "accused" in United States v. Dye, *supra* at 767, where the court refers to evidence that the "accused has knowledge of", or of the word "petitioner" in Hayes v. Wainwright, *supra* at 718, where the court speaks of "information . . . within petitioner's knowledge and thus available for his defense." Depending upon the context, those words can func-

tion simply as terms of art signifying either the ~ccused individually or counsel for the accused. The clear implication in the above cases is "counsel for the accused." *See* note 4. Similarly in Brady v. Maryland, *supra* at 87, where the evidence at issue had been specifically requested by the defense counsel, the court speaks of the withholding of evidence "on demand of an accused."

Raymond,[1] was walking south on the same sidewalk approaching her. As they met face-to-face he placed his gloved hand over her mouth so she could not scream and pulled her down onto the sidewalk. He then pulled up her skirt and slip and searched her for a money belt. Finding none, while she was lying there he searched her purse and removed three $1.00 bills and about $1.00 in change, a total of about $4.00 and asked her, "Are you sure that's all the money you've got?" She replied that was all she had.

While this occurrence took place, *from the street light ten feet away she had a close clear view of his face.* She saw no one else on the street at that time.

He then dragged her from the sidewalk into a gangway, paved with cement, to a point where it was quite light from either a window or a back porch light. While she was there lying down he tore off her panties and began to rape her, asking "weren't you ever raped before?" She answered in the negative. She thought the sexual act lasted about three minutes and said that during that period of time *"it was quite light"* and *"I could see good."* In answer to the question, *"And could you see his face during the three minutes or so when he was raping you?"*, she responded: *"Yes, yes, yes."* (Emphasis added.)

When the act of rape was concluded he said to her, "If you won't scream I won't hurt you." With that he left her lying there, her back hurting and her face bruised. She had difficulty getting up from the cement pavement, but finally did arise and started walking to her home a few doors away. She met two ladies and a man she had previously seen in the neighborhood, told them what had happened to her and asked them to help her home. One of the assisting ladies hailed a passing police car which stopped

and Officer Mallder came to her. Mrs. Barger told him what had happened and asked him to help her upstairs. The other three people left without their names being obtained.

She described her assailant to Officer Mallder as being colored, about 20 years of age, about 5 feet 10 inches in height, wearing a leather finger-tip jacket, a narrow brim hat and dark trousers. Officer Mallder assisted her to her upstairs apartment and after receiving her report of the occurrence and description of the assailant, he returned to his squad car and called in his report to the Central Communications Room. He then returned to her apartment and began making out his report.

In the meantime, Officer Forberg was cruising alone in a squad car at 67th & Stony Island and received over his car radio a report of a robbery and rape with a description of the assailant (as previously given). While traveling west on 68th Street about 6:10 p. m. he saw a man answering this description run out of an alley. The officer got out of his car and chased the running man. After two commands, the man stopped and asked "What's wrong, Officer?" He was handcuffed and started a commotion and was put into the squad car. This was about five blocks from the point where Mrs. Barger was raped. Other officers arrived to help Officer Forberg. While en route to the 10th District Station they heard the radio description of the assailant and detoured to the home of the victim.

Two police officers and a police sergeant entered Mrs. Barger's apartment with petitioner. Petitioner was there with the officers about ten minutes. During that time petitioner said nothing to Mrs. Barger and she said nothing to him. Officer Mallder said she was "very hysterical, very nervous." She said she

---

1. Robert Raymond was referred to as the defendant in the state court trial proceedings and as petitioner in various post-trial proceedings. He is variously referred to as petitioner, appellant, petitioner-appellant and defendant in his federal habeas proceedings. For the sake of simple clarity I shall refer to him here as petitioner.

was "frightened" of petitioner, "was all upset" and "couldn't talk." She then told the officer to "get him out of here;" "I don't want to see him, get him out of here." *She made no attempt to identify petitioner at that time. She did not say she could not identify him.*[2]

Petitioner was taken from her apartment by the officers who brought him there and Officer Mallder took Mrs. Barger to the Jackson Park Hospital where she was examined for about fifteen minutes by a doctor in an emergency room. While there her daughter and son-in-law arrived. Officer Mallder returned to the 10th District Station alone and Mrs. Barger was taken to this station by her daughter and son-in-law. This completed Officer Mallder's association with the occurrence.

Later that evening Officer Forberg saw petitioner coming out of the lockup. As petitioner passed him, petitioner said to him, "I did it, but you'll never prove it." When Mrs. Barger returned to the station with her daughter and son-in-law, a line-up of eight men, including petitioner, was taking place under the direction of police detectives. Four officers, a number of "victim" witnesses and others were present. Mrs. Barger viewed the line-up and immediately identified petitioner as "the man that robbed me and raped me." Her identification of petitioner was corroborated by two detectives, Kabor and McCarthy. Petitioner was dressed the same as earlier that evening.

The next morning Mrs. Barger was present at the Sex Bureau on the first floor in the Criminal Court Building at 26th and California. Also present were Assistant State's Attorney Patrick Egan, Officer Forberg, Detective Prunkle and petitioner. Mrs. Barger testified that petitioner asked the Assistant State's Attorney if he could talk to her and was given permission to do so. Petitioner then said to Mrs. Barger, "You know,

Ma'm I'm awfully sorry for what I did to you last night;" and "When I left the house, I didn't intend to do anything wrong." He further admitted he took the three singles and about $1.00 in change from her purse which she was then carrying. Officer Forberg corroborated Mrs. Barger, testifying that at that time petitioner said to her, "Miss, I am sorry for what I did. I know I caused you a lot of trouble. I can't face my family or my friends. I am trying to apologize but I am doing a bad job at it." Further, Officer Forberg quoted petitioner as saying, "I seen your purse and all I wanted was the money that was in your purse." Detective Prunkle corroborated Mrs. Barger, testifying that on that occasion petitioner said to her, "that he was sorry for what he done the night before, and he was ashamed of what disgrace he brought on his people, and that he was no good, and that he should be put away and he kept repeating it to the victim that he was very sorry for what he had done." Also, the witness testified, "She had a black purse," and petitioner identified the purse and told the Assistant State's Attorney Patrick Egan that "that was the purse he took the money out of."

Petitioner testified in his own defense. In substance, he denied all of incriminating statements attributed to him, he denied robbing and raping Mrs. Barger and he attempted to establish an alibi by three witnesses that he was not present at the time and place where the robbery and rape occurred. He testified that he made no admissions at the Sex Bureau but stated that he did ask to speak to Mrs. Barger there for the purpose of telling her he was sorry for what happened to her the night before; that this was a serious charge against him and she was making a grave mistake and he wanted her to be sure of what she was saying; that he was only trying to get

2. Chief Judge Swygert's opinion refers to two showups during this short confrontation. The transcript shows that petitioner alone refers to two separate showups.

The testimony of Mrs. Barger and Officer Mallder implies there was only one showup.

across to her that she was making a mistake.

Petitioner made several unsupported charges of police brutality, all of which were refuted and denied.

In rebuttal, two white women, Eleanor Westlake and Lilly Grafton, who lived about five blocks from the scene of the alleged crime and near where petitioner was arrested, testified in substance that shortly after the time of the alleged crime, they were accosted in the vestibule of their apartment building by a black man answering petitioner's description and dress. One of them positively identified petitioner at the police line-up as the person who accosted them in their apartment vestibule. At petitioner's trial in open court he was positively identified by Mrs. Barger, Officers Mallder, Forberg, Kobar, McCarthy and Prunkle, together with Eleanor Westlake and Lilly Grafton, as the person referred to in their testimony as petitioner Robert J. Raymond.

## II

Petitioner was represented by counsel of his own choice from the time of his arraignment, through the trial, judgment and disposition of post-trial motions, judgments on the verdicts and sentencing. Following proceedings in the trial court, trial counsel was permitted to withdraw. Counsel for petitioner was appointed by the Supreme Court of Illinois and an appeal was filed in the Appellate Court of Illinois. The judgment of the Criminal Court of Cook County, Illinois was in all respects affirmed on March 25, 1965, reported in abstract form only as People v. Raymond, 57 Ill. App.2d 292, 206 N.E.2d 740 (1965).

The opinion of the Appellate Court of Illinois was delivered by Presiding Justice McCormick, concurred in by Drucker, J., and English, J. This opinion appears in full as an exhibit in the proceedings in the federal district court below. The only ground raised in the Appellate Court in any way relevant to the appeal now before us is "that the State has

failed to prove the defendant guilty of the crimes for which he was indicted, beyond a reasonable doubt." Mr. Justice McCormick engaged in a detailed statement and consideration of all the evidence much as we have hereinabove set out. He found that the "positive, clear and convincing evidence of the complaining witness would alone be sufficient to sustain defendant's conviction. * * * [and that] when we consider the *positive identification* and the other strong evidence of the complaining witness and the police officers we can only conclude that there was ample evidence on the basis of which the jury could have found the defendant guilty beyond a reasonable doubt." (Emphasis added.)

The Supreme Court of Illinois upheld the denial of post-conviction relief to defendant by the Circuit Court of Cook County, Illinois, after having appointed new and separate counsel for defendant on that appeal. People v. Raymond, 42 Ill.2d 564, 248 N.E.2d 663 (1969). At 42 Ill.2d 568–569, 248 N.E.2d 663, 665, the Supreme Court of Illinois gave express consideration to defendant's reliance upon Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), as support for his contention "that his constitutional rights were violated when he was taken for identification to the victim's apartment immediately after his arrest." Referring to Stovall, the Supreme Court of Illinois concluded, 42 Ill.2d at 568, 248 N.E.2d at 665: "Although the procedure followed by the police has been widely condemned, we find that after considering the totality of the circumstances of this case, defendant's constitutional rights were not violated." I agree with Chief Judge Swygert that the identification procedures followed in the initial showup in Mrs. Barger's apartment finds adequate support in Stovall, supra.

Although there is no showing that petitioner pursued his state court remedies by petition to the Supreme Court of the United States for certiorari, on June 2, 1970 (with still another court-appointed

attorney), petitioner filed his instant habeas corpus petition in the United States District Court for the Northern District of Illinois, the Honorable Edwin A. Robson, Judge (now Chief Judge) presiding. In his habeas petition, *inter alia,* petitioner raised the two issues now before us on this appeal, viz: (1) that the pre-trial identification procedures prejudicially tarnished the in-court identification of petitioner by Mrs. Barger; and (2) that the prosecution suppressed evidence favorable to his defense. On October 6, 1970, the eminent district judge with the entire record and transcript of the state court proceedings before him, including the opinions of the Illinois Appellate and Supreme Courts, and after reviewing the evidence below agreed with the Supreme Court of Illinois that "the totality of circumstances surrounding petitioner's initial confrontation with the victim was not 'so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law,'" citing Stovall v. Denno, 388 U.S. 293, at 301–302, 87 S.Ct. 1967, at 1972 (1967). Other habeas corpus claims were found to be frivolous on their face and not rising to constitutional dimensions.

Thus we find a division of three eminent justices of the Appellate Court of Illinois, a unanimous Illinois Supreme Court and a distinguished federal district court judge all in agreement that petitioner's federal constitutional rights were not prejudicially violated. I find myself to be in accord with them.

### III

■ Chief Judge Swygert correctly recognizes that the standard to be applied in judging a due process claim involving pretrial identification proce-

dures derives from Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). He further recognizes that the Court in *Stovall* refused to give retroactive application to the rule announced in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and in Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), requiring counsel at pretrial identification confrontations. He also properly recognizes that under *Stovall,* 388 U.S. at 302, 87 S.Ct. at 1972, if the identification procedures were "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law" and that any particular claimed violation of due process must depend on the "totality of circumstances surrounding it."

With due deference, I part company with Chief Judge Swygert when he holds that the combination of the showup with the line-up "so undermined the reliability of the eye witness identification as to violate due process." He is not impressed with the showing that Mrs. Barger was hysterical and upset at the showup in her apartment to the extent that she could not or did not identify petitioner at that time. Neither is he impressed with Mrs. Barger's power of observation to have been able to identify petitioner while the two attacks were made on her.

In my considered judgment there is no adequate support in the record to justify the startling conclusion reached by Chief Judge Swygert on this issue. I cannot believe that for the first time in the long and tortuous court history of this criminal proceeding it can now be said, on the record below, that "the conduct of the pretrial identification procedure violated petitioner's constitutional rights and that the resultant evidence was inadmissible at trial." [3]

---

3. If further analysis of the record be necessary, we quote with approval the summation by the Government in its brief on this appeal:
   " * * * in the present case, there are several critical factors negating the argument that the present identification pro-

cedures were 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' First of all, Virgie Barger had ample opportunity to observe the unmasked petitioner face-to-face in adequate lighting. Second, she had opportunity to clearly

Further, *under the record in this case* I do not find that Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), and other cases cited by Chief Judge Swygert, compel or even justify the holding of the majority. Rather, I find comfort in the rationale expressed by the author of the opinion in Bates v. United States, 132 U.S.App. D.C. 36, 405 F.2d 1104, at 1106 (1968).[4]

Just this week, on November 8, 1971, appears the publication of the opinion of the Sixth Circuit in Hancock v. Tollett, 447 F.2d 1323 (1971), where, in an extended review of *Stovall* in another pre-*Wade* case, the court finds no denial of due process notwithstanding a showup where the witnesses had had a good opportunity to view the robbers in a well-lighted area, followed by another confrontation at the jail some eight to ten days later.

Finally, if there be thought that a *per se* rule on findings of due process flows from *Stovall*, that thought has been laid to rest following the dissenting opinion of Mr. Justice Douglas in Biggers v. Tennessee, 390 U.S. 404, at 408, 88 S.Ct. 979, 19 L.Ed.2d 1267 (1968), and referred to in *Bates, supra,* 405 F.2d at 1106, fn. 3, and a host of other federal and state decisions.

Hence, it becomes obvious that on the mistaken identification issue I have read the record evidence differently than Chief Judge Swygert.

## IV

The second issue on this appeal concerns petitioner's contention that his constitutional right to due process was violated when the State did not introduce into evidence a police crime laboratory report of a microanalysis performed on petitioner's clothing showing a negative result.

The record discloses that petitioner gave his clothing to the police for test-

---

hear the petitioner speak. Third, there is no evidence that the emotional state of the witness was such as to preclude objective identification at the police line-up although, her emotional state did preclude and explain why Virgie Barger was unable to identify the petitioner in her apartment immediately after the crime and subsequent arrest. Fourth, the witness' observations of the petitioner were not so limited as to render them particularly amenable to suggestion or a tendency to identify on less than a positive basis. Fifth, the extrajudicial identification confrontation occurred within approximately three (3) hours of the crime—assuring reliability. Sixth, there is no evidence that in the above mentioned confrontation the petitioner appeared with other male Negroes unreasonably dissimilar from himself. Seventh, there is no evidence that any tangible objects related to the offense were placed before the witness or the petitioner during identification to encourage selectivity. Eighth, there is no evidence of consultation, hesitation, or equivocation in the witness' identification. Ninth, there is no evidence that the witness made any identification of another person as the rapist-robber prior or subsequent to any identification confrontation with the petitioner. Tenth, the witness testified positively on direct and unshakenly on cross-examination concerning her ability to observe the petitioner during the crime. Eleventh, petitioner was able to take full advantage at trial of the witness' failure to identify him at the initial confrontation at her apartment."

4. In speaking for the court the then Circuit Judge Burger wrote:

"There is no prohibition against a viewing of a suspect alone in what is called a 'one-man showup' when this occurs near the time of the alleged criminal act; such a course does not tend to bring about misidentification, but rather tends under some circumstances to insure accuracy. * * *

"Our review of the circumstances surrounding the apprehension of Appellant and the police conduct which led to his identification satisfies us that the claim that Appellant was denied due process of law is without merit; there was not 'substantial likelihood of irreparable *misidentification.*' To the contrary, the police action in returning the suspect to the vicinity of the crime for immediate identification in circumstances such as these fosters the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh."

ing, willingly and with his consent; he was told the results of the test the next day and knew then they were negative; he apparently did not tell his attorney about the test or results thereof; and he waited until after he had been found guilty and his motion for a new trial was coming up for hearing to request a copy of the report. The State promptly made it a part of the record in compliance with petitioner's request.

The majority recognizes that this is a case of first impression. The key question is whether the State, having immediately made known the results of the police laboratory tests to petitioner had a continuing constitutional duty to disclose the information to petitioner's attorney. The majority extends the rule of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and places the facts of the instant case under its umbrella. In doing so, I respectfully submit that the majority erred.

In *Brady,* the court said: "We now hold that the *suppression* by the prosecution of evidence favorable to an accused *upon request* violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–1197. (Emphasis added.)

Here it is clear that petitioner had full knowledge of the facts and this could hardly be called "suppression." Neither petitioner nor his attorney "requested" the evidence before or during the trial, although petitioner had full knowledge of its existence and content.

Finding that the evidence in question was *not exculpatory,* that petitioner knew of the report and was informed of the results of the analysis, yet he did not apprise his attorney of these facts, and waited until after he had been found guilty to exhibit any interest in its procurement, the Supreme Court of Illinois held that no deprivation of due process had been shown. People v. Raymond, 42 Ill.2d at 568, 248 N.E.2d 663. I agree.

Further, no case has been cited since *Brady,* and we know of none, wherein a court has found that evidence has been suppressed in violation of *Brady* when either the defendant or his attorney had knowledge of the evidence. Cases contrary to petitioner's contention and the majority holding are Hayes v. Wainwright, N.D.Fla., 302 F.Supp. 716, 718 (1969) and Pugliano v. Staziak, W.D.Pa., 231 F.Supp. 347, 354, fn. 10 (1964).

On this issue I would hold that there was no suppression of evidence in violation of *Brady.*

In sum, I would affirm the judgment of the district court.

PELL, Circuit Judge (dissenting in part and concurring in part).

The opinions prepared by my brothers of the panel are persuasively put and each contains a painstakingly careful analysis of the pertinent issues. Nevertheless, and regretfully, I am unable to concur in toto with either.

■ Upon the basis of the factual situation presented by the record, I find no violation of Raymond's constitutional rights in the conduct of the pretrial identification procedure. Hence, I concur in the opinion of Senior Judge Hastings that the petition for a writ of habeas corpus was properly denied insofar as the identification procedure is concerned.

■ However, although the question may well be a close one, I must concur with Chief Judge Swygert that the State did not discharge its duty to disclose evidence to the defendant.

I reach this conclusion somewhat reluctantly in view of the clear exposition in Judge Hastings' opinion of the facts showing Raymond's guilt of a crime which cannot be typified other than as heinous. My reluctance does not flow from any premise that where guilt is reasonably clear we should overlook or minimize constitutional violations having a substantial likelihood of contrib-

uting to the conviction. However, every judge cannot but be painfully aware that substantial segments of the citizenry are critical of judicial decisions the effect of which might be to release an apparently guilty criminal before he has served his debt to society because of the inherent difficulties attendant upon a retrial many years after the incident in question. None of us willingly want to participate in a decision which might cause the public to have less than high regard for our system of judicial administration.

Yet this is a risk which must be assumed if the great immunity of every person from deprivation of life, liberty, or property without due process of law is to be something more than glowing phrases to be mouthed hollowly from flag bedecked platforms.

In that context, I turn to the issue before us. There seems to be no disagreement as to the facts and very little, if any, disagreement as to the basic law.

As to the facts, Raymond was aware that the laboratory test had been made and the negative results of it. This was not based upon police testimony that he was told but by his own admission (which I regard as refreshingly candid considering its cruciality) that he was told by the commander at the police station, "The results of the test on your clothing came back and proved negative, but this don't [sic] clear you."

It is further undisputed that Raymond's counsel was not aware of the lab test or its results until after the trial and conviction.

No reason appears in the record for the defendant's failure to inform his attorney about the test although it is difficult to conceive why he would not have done so since it appears to have been about the only thing "going" for him at the time.

The petition states that Raymond thought the State would, as a part of its duty to protect all concerned, the accused as well as the accuser, introduce the results of the test in evidence. While a criminal trial should, for the purpose of establishing guilt or innocence, bring forth all of the pertinent facts and not be a game of skill, I know of no authority which would require the State itself to put the test results into evidence.

Perhaps more crucial as to the reason for the failure of communication is the allegation of the petition that the matter had not been mentioned in the *two* interviews between attorney and client in the *eight* months of incarceration.

As to the law, the panel is in agreement that the suppression by the prosecution of evidence favorable to an accused upon request by the accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Of course, there was no request but counsel apparently was not clairvoyant and Raymond individually had not reached the stage of some present-day defendants of trying his own case. In any event, post-*Brady* authority indicates the request is not necessarily crucial and with this I would agree. Barbee v. Warden, Maryland Penitentiary, 331 F.2d 842 (4th Cir. 1964).

Disagreement in the panel, however, is centered on the question of whether it is sufficient that the accused alone be aware of the evidence. I join Chief Judge Swygert in holding that it is not.

From the cornerstone of Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), we now have firmly fixed the concept of the right of the State-accused defendant to counsel under the 14th Amendment.

"The right to counsel at the trial (Gideon v. Wainwright, 372 U.S. 335 [83 S.Ct. 792, 9 L.Ed.2d 799]); on appeal (Douglas v. California, 372 U.S. 353 [83 S.Ct. 814, 9 L.Ed.2d 811]);

and at the other 'critical' stages of the criminal proceedings (Hamilton v. Alabama, *supra* [368 U.S. 52, 82 S. Ct. 157, 7 L.Ed.2d 114] (1961)) have all been retroactive, since the 'denial of the right must almost invariably deny a fair trial.' See Stovall v. Denno, 388 U.S. 293, 297 [87 S.Ct. 1967, 18 L.Ed.2d 1199]." Arsenault v. Massachusetts, 393 U.S. 5, 6, 89 S.Ct. 35, 36, 21 L.Ed.2d 5 (1968). (Footnote omitted.)

Returning to *Powell, supra,* I note the basic tenet that the duty of assigning counsel "is not discharged by an assignment at such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case." 287 U.S. at 71, 53 S.Ct. at 65.

It seems patent to me that the suppression of material evidence from the counsel is to preclude the giving of effective aid, the very purpose of having counsel.

Returning to the evidence, while the Supreme Court of Illinois states in People v. Raymond, 42 Ill.2d 564, 568 (1969), the evidence was not *necessarily* exculpatory, it clearly in my opinion *was* exculpatory.

It should not take particularly skilled counsel, given the prosecuting witness's description of the time, manner and extent of the rape, to argue most effectively that if he had been the culprit the indicia of the ill deed most certainly would have been on his clothing. Because the State did not make the information available, the jury was unaware of what, with an alibi, might well have been crucial evidence. I cannot conceive that the absence of the evidence since it stemmed from suppression permitted a fair trial.

The result of the jury's verdict might have been the same with this evidence before it but for us to say so could only be on a basis of speculation. Suffice it to say, I cannot assert in the setting of this particular case, notwithstanding the incriminating evidence, the constitutional error was so unimportant or insignificant that it could be deemed harmless. In other words, I am unable to declare belief that it was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 22, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

I am aware that the decision on this point seems to amount to a per se rule but it appears to me to be a healthy rule that the elimination of suppression of material evidence should take the form of communication to the attorney for it is he who will make the determination of what to present and what not to present to the trier of fact in the guilt determination process. It is he who has the expertise for evaluation of what may be helpful or hurtful to his client's cause.

The establishment of a per se rule will eliminate the temptation to law enforcement officials to communicate only with the accused with the thought that he may not tell his attorney because of insufficient contact with him, lack of appreciation of the true significance of the communicated data or just pure inadvertence. In such event, the task of conviction is, of course, simplified.

It is not necessary, in my opinion, to determine whether every instance of suppression will constitute harmful error. We are concerned only with the factual situation of this case where the suppression could have been harmful. The great writ, in my opinion, should have been granted on this issue with appropriate opportunity afforded to the State for the retrial of the defendant.